## WILLIAMS v. WATTS et al.

No. 6004.

Court of Appeal of Louisiana. Second Circuit.

Jan. 5, 1940.

Rehearing Denied Feb. 7, 1940.

Writ of Certiorari and Review—Denied April 1, 1940.

P. E. Brown, of Arcadia, for appellant.
R. L. Williams, of Arcadia, for appellee.

HAMITER, Judge.

A tract of land containing 120 acres and located in Bienville Parish, Louisiana, was acquired by John L. Watts during his marriage with Mrs. Willie Watts, and thereon he established and maintained his home. Surviving him on his death in 1917 were his said wife and five minor children born of that union.

Subsequently, the widow, together with her children, moved to another locality, and she married one J. J. Huckabay. The taxes due on the tract from 1920 to 1925, inclusive, were paid by the latter.

Mrs. Huckabay, on December 27, 1924, mortgaged her undivided one-half interest in said property to Bryan-Hamner Company, W. A. Bryan, receiver, to secure payment of her note for $449.40.

On June 25, 1927, the tax collector of Bienville Parish, Louisiana, adjudicated the tract to Andrew Wimberly, a cousin of the Watts children, for the sum of $32.85, this amount representing the unpaid taxes for the year 1926, with interest and costs due thereon. Wimberly's tax deed was received and filed for record by the Clerk of Court on July 6, 1927, and recorded on July 7, 1927.

An act of conveyance describing the 120 acres of land and reciting a cash consideration of $1,000 was executed on July 3, 1930, by the said A. L. Wimberly in favor of Francis L. Watts, the latter being one of the children of John L. and Mrs. Willie Watts. It was filed for record on the execution date but not recorded until July 7, 1930.

On October 14, 1931, Mrs. Vera Watts Williams, another of the children born of the mentioned marriage of John L. Watts, instituted this suit against the said Francis L. Watts and A. L. Wimberly. She seeks judgment recognizing her as the owner of an undivided one-tenth interest in the above described property, annulling the tax adjudication in favor of Wimberly and the conveyance by Wimberly to Francis L. Watts, and ordering the cancellation of the two deeds. For a cause of action, plaintiff alleges:

"That the said tax sale is null and void, and consequently the subsequent deed above mentioned is null and void and conveys no title to the said F. L. Watts, because of the following facts and circumstances:

"At the time of the said tax sale the defendant, F. L. Watts, entered into a fraudulent collusion with a kinsman, Andrew Wimberly, to allow the property of the J. L. Watts Succession to sell for delinquent taxes and to be bought in in the name of said Wimberly. That in reality F. L. Watts advanced the money for the said purchase and the adjudication was made in the name of Andrew Wimberly for convenience only and in order that the property might remain in the nominal ownership of said Wimberly for three years.

"That as a matter of fact, the said Wimberly never owned the land, nor did he enter into possession of same, but the defendant, F. L. Watts, held possession of said land from the time of the tax sale until the present time and still remains in possession and undertakes to hold the property against the claims of the other heirs, especially your petitioner.

"That the deed from A. L. Wimberly to F. L. Watts, dated July 3rd, 1930, and re-

corded in Book 92, Page 75 of the Conveyance Records of Bienville Parish, Louisiana, expresses a consideration of One Thousand Dollars; but as a matter of fact the consideration mentioned in said deed was never paid by F. L. Watts to A. L. Wimberly, but this transfer was merely a part of the transaction which consummated the act of collusion between them, to the end that the title might be lodged in F. L. Watts;

"That the said F. L. Watts, as one of petitioner's co-heirs in the John L. Watts Estate, owed a duty not only to petitioner, but to the other heirs and co-owners to protect the property, instead of allowing it to be adjudicated at said tax sale.

"That the effect of the adjudication of the lands at the tax sale as above mentioned and the subsequent deed to F. L. Watts was simply the payment of the delinquent taxes for the benefit of the succession, inasmuch as F. L. Watts was a co-owner with the other heirs in the J. L. Watts succession property; and his possession under the said tax sale is a possession for the benefit of the other heirs, including your petitioner."

Francis L. Watts filed pleas of prescription of one, two, three and four years. Thereafter, he answered denying that he advanced the funds used in acquiring the property at tax sale, and affirmatively alleging that he purchased it from Wimberly in good faith, paid $1,000 in cash therefor, and assumed possession of it under his deed.

No appearance was made by Wimberly, the other defendant, and a preliminary default was entered against him.

The trial of the case was had in the year 1938, and on January 17, 1939, the court rendered judgment sustaining the plea of prescription of three years and dismissing the suit at plaintiff's cost.

This appeal, perfected by plaintiff, followed.

In view of the conflicting testimony of the witnesses regarding certain material and important facts, it is well to first determine the question of who carries the burden of proof in cases of this character.

In the early case of King v. Atkins, 33 La.Ann. 1057, the Supreme Court gave consideration to an allegedly simulated transfer of real estate made under a writ of sale in a succession proceeding, and, on the question of burden of proof, expressed itself as follows: "With reference to attacks upon titles on the ground of simulation, the doctrine is not extended to the point that the mere averment that there was no real sale and no price paid, puts the opposite party upon proof of reality and payment. But the truth is recognized that simulation, from its nature, can, usually, be proved only by indirect and circumstantial evidence; and when circumstances are established sufficient to throw doubt upon the reality of the sale, the burden of proof is shifted to the parties, who know the facts and can establish them by their evidence. When, under such circumstances, they fail to furnish the evidence clearly within their power, all the presumptions of law are against them."

The King case was referred to approvingly in First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155, 158, and the court therein said: "It is true that in suits to set aside transfers of real estate on the ground of fraud or simulation it is necessary for the party attacking the transfer to do more than merely allege that the transfer was fraudulent or simulated. But when it is so alleged and the plaintiff offers testimony which is sufficient to raise a clear presumption that the transaction was not genuine, the burden is shifted to the defendant to show the verity of the transfer."

In substantiation of the allegations of her petition plaintiff testifies that defendant Francis L. Watts had possession of and worked the property at the time of the tax sale and subsequently; and that shortly after the adjudication, while visiting at his mother's home, he stated that he had saved up some money and turned it over to Wimberly to buy in the property for the purpose of defeating an existing mortgage, and that later it would be divided among all the heirs. He further told her, on another occasion, according to her testimony, that he did not pay $1,000 to Wimberly.

The testimony of J. L. Watts, Jr., and Mrs. Jessie Nell Williams, who are two other children, and of their mother, Mrs. Huckabay, is substantially identical with and strongly corroborative of that of plaintiff. Additionally, the mother was of the belief that Francis could not have saved a thousand dollars, for he had told her in 1926 and several times thereafter that he was not making or saving anything; and she further testifies that he "drank whiskey like all other boys did, ran around and spent his money, spreed it out."

Defendant Watts denies having engaged in conversation with the members of his family regarding the property between the time of the tax sale and the date of his deed from Wimberly, a period of three years. When asked if they were not told of his intention to divide the property among the heirs after the title was cleared, he says: "I might have said something like that after I brought it in, I might have." He also states that he knew nothing of the adjudication for unpaid taxes until four or five months after its occurrence, and that he did not supply Wimberly with the funds necessary to make the purchase.

Some of his additional testimony is that he was born in 1908, thus making his age 19 in 1927, and 22 in 1930. From July, 1926, until the fall of 1929, when he married and moved on the property, he lived with L. L. Golson about one-half mile away. During the last half of 1926, a wage of $25 per month was paid him by Golson for farm labor. In the years of 1927 and 1928, he made crops of cotton on land belonging to Golson, and he was allowed to retain the entire proceeds therefrom as compensation for services that he rendered to such landowner. Each of those crops produced eight bales. The property involved in this suit was farmed by him in 1929, under a $50 rental agreement with Wimberly that was evidenced by his note, and thereon he made seven bales of cotton. The $1,000 cash, which he paid for the land in 1930, was saved from the proceeds of the above described ventures.

Regarding his mentioned savings, he says:

"Q. How long had you been saving money then, in 1930? How long had you been working and saving money? A. Well, I don't know, that is most too personal a question to answer.

"Q. You can tell how long you have been working, earning wages can't you? A. I have answered the question once.

"Q. Well, how long did you say? A. Something like four years.

"Q. You saved all this money yourself? A. Sure.

"Q. Four years you saved up $1,000? A. Yes.

"Q. Had it in your pocket? A. Yes."

Golson, who is a first cousin of the Watts children, gives testimony that accords with that of Francis Watts in many particulars. Two glaring inconsistencies, however, are noticeable. He says that defendant Watts worked for him throughout 1927 as a farm laborer at a wage of $25 per month instead of making a crop as claimed. The other contradiction relates to the saving of $1,000, and is shown by the following questions propounded to Golson, and his answers:

"Q. How do you know he had a thousand dollars? A. Well, he was living there with me and he hauled his cotton with my team, I knew that he had that much or more.

"Q. Did you ever see the thousand dollars? A. Well, if you had a fellow living with you and hauling cotton around and knowed what you paid him wouldn't you have an idea what he had?

"Q. You know whether he had a bank account? A. Sure.

"Q. What did he do at that time, did he do his business in the bank or keep cash or what? A. Well he kept the cash, I kept it for him.

"Q. How did you keep his money? A. I kept mine in the bank. I am afraid some fellow might knock me in the head.

"Q. How did you keep his money? A. He just turned it over to me and I kept it.

"Q. Did you keep his money in the bank or at the house? A. I kept it in the bank."

Golson's further testimony is that the money remained in the bank, and he let Francis Watts have it "when he got ready to buy his home." Contradicting Mrs. Huckabay, the mother of the children, he says that defendant Watts did not drink and was thrifty.

Golson was a witness on the deed from Wimberly to Watts and testifies as follows regarding the payment of the recited $1,000 consideration:

"Q. Do you know how much the deed called for? A. I heard Wimberly say awhile ago it called for $1,000.

"Q. Do you know what, did you know at that time what it called for? A. It wasn't any of my business.

"Q. You didn't see any $1,000 that day did you? A. It is about all I can do to tend to my business.

"Q. I want to know if you saw a $1,000 at that day? A. The boy had that much money.

"Q. I didn't ask you that, I asked you if you saw it that day? A. The boy had that much money.

"Q. Where did he have it, in the bank? A. Well, if you was going to buy some land wouldn't you supposed to have some money?

"Q. I asked you where he had the money? A. Had it in his pocket, I reckon."

Wimberly, a relative and close friend of the family, says that he purchased the property at the tax sale with his own money, and three years later was paid $1,000 in cash by Francis Watts for its transfer. As to his disposition of these funds, he is questioned and states as follows:

"Q. Now Mr. Wimberly what did you do with the thousand dollars that Mr. Francis Watts paid you? A. Why I couldn't just positively say what I done with that particular money, you take a fellow got a little money he ain't never paying no mind to what he is spending it for.

"Q. Do you know whether you banked it? A. Of course I did.

"Q. Whether you paid it out for some other property? A. I know I didn't do that."

Wimberly, who did not go on the tract very often, recalls that Watts gave him a note for rent in 1929, but he does not remember the amount thereof and cannot state positively who prepared it.

■■■ The above detailed testimony of plaintiff and her witnesses and various circumstances disclosed by the record are sufficient, in our opinion, to cast doubt upon the genuineness of the assailed tax adjudication and conventional transfer. Among the circumstances referred to are Wimberly's close kinship and friendliness with the Watts family, his failure to assume active possession of the property, his execution of the conveyance act in favor of Francis Watts immediately upon the expiration of a period of three years after the tax deed's recordation, and the claimed but seemingly improbable saving of $1,000 by said Watts, who was then just approaching and attaining the age of majority, from the ventures undertaken during the four-year period. With a prima facie case of simulation thus made out by plaintiff, the burden of proof, as stated in the above cited authorities, shifted to defendants. The question then arising is, has this burden been discharged? We think not. The indefiniteness of the defense proof, the obvious evasiveness displayed by Francis Watts and his witnesses in answering the propounded questions, and the mentioned conflicts in their testimony relating to material facts, combine to compel this conclusion. If Golson banked money for Watts and delivered the savings when the latter became ready to buy his home, such important actions could have been easily established by definite and conclusive evidence. Similar proof was available to show the banking of the $1,000 by Wimberly, which he says was done; but it was not produced.

As defendants have failed to overcome the prima facie case established by plaintiff, it must be held that she has not been divested of her interest in the property; and that the tax adjudication to Wimberly and the transfer of his interest to Francis Watts operated merely as payment of the taxes by the latter for the joint benefit of his co-heirs. Of course, defendant Watts is entitled to be reimbursed for all taxes paid by him and all attendant expenses.

■■■ The pleas of prescription urged in support of the tax adjudication are without effect, in view of the above holding.

For the reasons assigned, the judgment of the district court is reversed and set aside, and the pleas of prescription are overruled; and there is now judgment in favor of plaintiff and against the defendants recognizing her as the owner of an undivided one-tenth interest in the above described property, annulling the tax adjudication to Wimberly and his purported sale to Watts, as to said undivided one-tenth interest, and ordering the cancellation and erasure from the records of Bienville Parish, Louisiana, of the deed evidencing each transfer to that extent. All rights to claim reimbursement for taxes paid and other expenses are reserved to defendant Watts. The defendants shall pay all costs of both courts.